## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal Action No. 05-246 (RMC)** |
| ) | |
| **JOSE LUIS CONTRERAS-MACEDAS,** ) | |
| **et. al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Jose Luis Contreras-Macedas, David Mora-Gil, Peles Francisco, Raymundo Lopez-Vargas, Pedro Hernandez-Carlon, Remigio Gonzalez-Olvera, and Oscar Aguilar-Gomez ("Defendants") challenge the criminal indictment against them charging them with possession of fraudulent identification documents and aggravated identity theft. They seek to dismiss the indictment against them pursuant to the Speedy Trial Act and Federal Rule of Criminal Procedure 48(b) for unnecessary delay in prosecution and for lack of evidence on the aggravated identity theft charge. The Court concludes that the Government did not purposely delay prosecuting the Defendants and that there is sufficient evidence to support the aggravated identity theft charges in the indictment. The Defendants' motions to dismiss will be denied.

### I. BACKGROUND

Defendants were charged in a September 22, 2005, superseding indictment with the sale and possession of false immigration documents. Specifically, the Defendants were charged with possession of fraudulent documents prescribed for authorized stay or employment in the United States, in violation of 18 U.S.C. § 1546(a); production of false identification documents, in violation

of 18 U.S.C. § 1028(a)(1); transfer of false identification documents, in violation of 18 U.S.C. § 1028(a)(2); possession of five (5) or more false identification documents, in violation of 18 U.S.C. § 1028(a)(3); and possession of document-making implements, in violation of 18 U.S.C. § 1028(a)(5). The indictment also included charges for conspiracy to commit these offenses and aiding and abetting commission of these offenses. The indictment also charged Contreras-Macedas, Mora-Gil, Francisco,[1] and Lopez-Vargas[2] with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

According to the indictment, the Defendants were engaged in a conspiracy, from about February 1, 2005, to August 2, 2005, that involved forgery and alteration of resident alien cards, employment authorization cards, and social security cards. These documents were used to assist illegal aliens to remain in the United States and work here. Since illegal aliens would be otherwise unable to work, these fraudulent documents gave them an "identity" to use to stay in the country and obtain gainful employment. The Defendants sold the false identification documents to illegal aliens, according to the indictment, near the 1600 to 1800 blocks of Columbia Road NW in Washington, D.C. Orders for the false documents were allegedly brought to the Defendants at 526 Tuckerman Street NW, where document-making implements, such as a typewriter, a laminating machine, and laminating paper, were located.

Specifically, the indictment alleges that Contreras-Macedas possessed an order for false identification documents and laminating paper on May 10, 2005. On the same day, Mora-Gil

---

[1] Francisco was also charged with unlawful possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5)(A).

[2] Lopez-Vargas was also charged with unlawful reentry of a removed alien, in violation of 8 U.S.C. § 1326(a).

was found in possession of several orders for false identity documents. The indictment also alleges that Contreras-Macedas and Mora-Gil were in possession of fraudulent social security cards, permanent resident cards, and an employment authorization card.

The indictment further alleges that Francisco attempted to solicit customers to purchase false identity documents in the 1600 to 1800 blocks of Columbia Road NW on June 21, 2005, and on August 2, 2005, he was found at 754 Harvard Street NW in possession of more than 100 false identification documents, including fraudulent resident alien cards and social security cards, and blank laminating sheets. Francisco also allegedly had in his possession document-making implements, including two laminating machines, two typewriters, and a paper cutter, as well as a firearm.

On August 2, 2005, Lopez-Vargas allegedly possessed orders for false identification documents at 526 Tuckerman Street NW; he is also alleged to have had fraudulent resident alien cards, employment authorization cards, and social security cards. He is charged with possession of two laminating machines, two typewriters, and a paper cutter, as well as five cameras. The indictment alleges that these document-making implements were to be used to produce false identification documents. Lopez-Vargas also is charged with being illegally present in the United States on August 2, 2005, since he had previously been deported.

Additionally, Hernandez-Carlon allegedly entered 526 Tuckerman Street NW on July 26, 2005. On August 2, 2005, Gonzalez-Olvera allegedly had a ledger, which recorded the sale of false identification documents, in the trunk of his car. Finally, in August 2005, Aguilar-Gomez was found in possession of blank resident alien cards, which were allegedly intended to be used to make false resident alien cards.

To support the allegations of aggravated identity theft, the indictment alleges that, on May 10, 2005, Contreras-Macedas transferred false identification documents, consisting of a false social security card, a false permanent resident card, and a false employment registration card, each of which contained identification numbers of another person(s). Mora-Gil is alleged to have engaged in the same behavior on May 10, 2005, possessing a false social security card and false permanent resident card with identification numbers that belonged to another person(s). Francisco is alleged to have possessed, on August 2, 2005, a false social security card and false resident alien cards with identification numbers that belonged to another person(s). Lopez-Vargas is also alleged to have been in possession, on August 2, 2005, of false social security cards and false resident alien cards with identification numbers that belonged to another person(s).

Mora-Gil and Contreras-Macedas were both arrested by Immigration and Customs Enforcement ("ICE") agents on May 10, 2005, indicted on June 28, and arraigned on July 14. They were held on an immigration detainer until July 13, 2005. After their arrest, ICE began administrative removal proceedings, and Contreras-Macedas and Mora-Gil each signed a stipulated request for removal order[3] on May 11, 2005. An immigration judge signed the Defendants' order of removal on July 1, 2005.

Gonzalez-Olvera, Aguilar-Gomez, and Hernandez-Carlon were arrested by ICE agents on August 2, 2005, indicted on September 22, 2005, and arraigned on October 6. These Defendants signed stipulated requests for removal orders on the day they were arrested. An

---

[3] According to the testimony of ICE Agent Joseph Arrieta on March 17, 2006, this stipulated request for removal essentially informs ICE that the defendant will not fight removal, that he "wants to go home." Hr'g Tr. at 13, Mar. 17, 2006 (testimony of Agent Arrieta). ICE has ninety days after entry of a removal order by an immigration judge to complete the removal process, including transportation of the defendant back to his home country. *Id*. at 7.

immigration judge signed removal orders for Hernandez-Carlon and Gonzalez-Olvera on August 12, 2005, and signed a removal order for Aguilar-Gomez on August 15, 2005.

Lopez-Vargas was arrested by ICE agents on August 23, 2005, and was arraigned on October 6. He had a prior deportation order that was reinstated on the date of his arrest. Francisco was arrested on August 2, 2005, on an outstanding bench warrant relating to a firearms violation. He was indicted on August 3, 2005, for the firearms charge, and again on September 22, 2005, for the identification theft charges. He was in ICE custody on August 9, 2005, and he was arraigned on September 26, 2006.

## II.  ANALYSIS

### A.  Prosecutorial Delay

The Defendants claim that there was unnecessary delay after their administrative arrests, and they ask the Court to dismiss the indictment pursuant to Federal Rule of Civil Procedure 48(b). They also argue that the Government should have obtained an indictment within thirty days of their arrest, as required by the Speedy Trial Act, 18 U.S.C. § 3162(b). The Court will address each of these arguments in turn.

### 1.  Federal Rule of Criminal Procedure 48(b)

Federal Rule of Criminal Procedure 48(b) permits a court to dismiss an indictment, information, or complaint "if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Subsection (b), according to the Advisory Committee Notes for the 1944 adoption of Rule 48, "is a restatement of the inherent power of the court to dismiss a case for want of prosecution." Mora-Gil filed a motion

to dismiss his indictment pursuant to Rule 48(b), and the other Defendants[4] joined the motion, on the theory that they all were seeking similar relief.

Relying on *United States v. Jones*, 524 F.2d 834 (D.C. Cir. 1975), *United States v. DeLuna*, 763 F.2d 897 (8th Cir. 1985), and *United States v. Clay*, 481 F.2d 133 (7th Cir. 1973), Defendants claim that the approximately two months that elapsed between their administrative arrests and their presentation on the criminal indictment was an unnecessary delay in prosecution, warranting dismissal of the indictment. However, none of these cases supports the Defendants' claim. Indeed, in each case, the Court of Appeals determined that the delay that the defendant challenged was not unreasonable and did not warrant dismissal.

In *Jones*, the D.C. Circuit Court of Appeals noted that "any unreasonable or unnecessary pre-arrest delay which results in prejudice to the accused may necessitate dismissal of the charges against him." 524 F.2d at 839. However, the court found that the thirteen-month delay between the defendant's crime and his arrest did not warrant dismissal because the defendant failed to demonstrate that the delay was reasonably avoidable or that it prejudiced his ability to present a defense. *Id.* at 845. The court found that the delay was not unreasonable given that law enforcement officials did not know the defendant's name. *Id.*; *see also DeLuna*, 763 F.2d at 923 (holding that trial court did not abuse discretion in denying defendant's rule 48(b) motion where an eighteen-month delay between indictment and trial was "the result of the need of the prosecution and defense to prepare for the trial" and "there was no purposeful delay by the government"); *Clay*, 481 F.2d at 137-38 (eight-month delay between arrest and indictment did not warrant dismissal where no

---

[4] Although Francisco originally joined this motion, he orally withdrew his motion during a hearing before this Court on February 13, 2006. Therefore, only the motions of Contreras-Macedas, Mora-Gil, Gonzalez-Olvera, Aguilar-Gomez, Lopez-Vargas, and Hernandez-Carlon remain.

unusual circumstances, such as prolonged inactivity, are shown because "if no unusual circumstances are shown, past delay does not justify dismissal of a case which is in fact going forward with appropriate speed").

Defendants do not cite to any cases that stand for the proposition that the two-month delay in this case was unreasonable or unnecessary, warranting dismissal.[5]  The Court denies the Defendants' motions to dismiss the indictment under Rule 48(b).

## 2. Speedy Trial Act

Pursuant to the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, an "information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . in connection with such charges."  18 U.S.C. § 3161(b).  If an indictment is not filed within this time limit, "such charge against that individual . . . shall be dismissed or otherwise dropped."  18 U.S.C. § 3162(a)(1).  The Defendants contend that the Government violated the Speedy Trial Act by failing to file an indictment within thirty days of their arrests.  The Government counters that the Speedy Trial Act's thirty-day rule does not apply since the Defendants were initially arrested by ICE for administrative reasons, that is, for being present in this country as illegal aliens.

Citing *United States v. Drummond*, 240 F.3d 1333, 1335 (11th Cir. 2001), the Government contends that because administrative detentions for the purpose of deportation are not criminal in nature, the Speedy Trial Act's thirty-day rule is not triggered.  "The thirty-day

---

[5]  The fact that the two-month time period between the Defendants' administrative arrests and issuance of the criminal indictment was well within the ninety-day removal period described by ICE Agent Arrieta also supports the reasonableness of the delay.  *See* Hr'g Tr. at 13, Mar. 17, 2006. Even if the indictment had not been issued, the Defendants would still have been detained pending removal.

requirement applies to an indictment issued in connection with the offense for which the defendant was arrested." *United States v. Cepeda-Luna*, 989 F.2d 353, 355 (9th Cir. 1993). The Defendants were all detained on immigration charges rather than charges stemming from possession of fraudulent documents. Since the Defendants were not detained pursuant to a criminal charge, the plain language of the Speedy Trial Act does not support the Defendants' interpretation; quite simply, the initial administrative arrests were not connected to the criminal charges eventually presented in the indictment.

This Court has heard evidence that it is the standard practice for ICE to remove a defendant from a deportation list once the Government has an indictment and a criminal arrest warrant is issued. Hr'g Tr. at 29, Mar. 17, 2006 (testimony of ICE Agent Arrieta). If no criminal arrest warrant is issued, a defendant remains in the deportation process until he is removed from the country. *Id.* The Government argues that only after it obtained indictments and warrants to arrest the Defendants on criminal charges did ICE take the Defendants off the deportation list. The Government also asserts that if a defendant is removed prior to issuance of the indictment or arrest warrant, the removal process continues with no reference to the pending criminal matters. The Defendants respond that their removal proceedings were delayed in order to give the Government additional time to prepare its criminal case against them.

The Defendants argue that *Drummond* contains an exception to the general rule that the Speedy Trial Act is not triggered in cases of administrative detentions. In cases where an administrative detention is a mere "ruse" to detain a defendant for criminal prosecution in the future, then the Act applies. *Drummond*, 240 F.3d at 1336. The Defendants have the burden of proving that the primary purpose of the civil arrest was to hold them for future criminal prosecution. *Id.* (citing

*United States v. Noel*, 231 F.3d 833, 836 (11th Cir. 2000) and *United States v. Cepeda-Luna*, 989 F.2d 353, 357 (9th Cir. 1993)).

> [C]ivil detention should not be used as a delay tactic.  We view the 'ruse exception' as an effective way of protecting against the possibility of collusion between federal criminal authorities and civil or state official.  However, we will only apply this exception where the defendant demonstrates that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution.

*United States v. de la Pena-Juarez*, 214 F.3d 594, 598 (5th Cir. 2000) (citations omitted).  "We . . . are sympathetic to the plight of defendants who are detained for long periods of time simply due to government inefficiency.  However, absent evidence of collusion, the Speedy Trial Act is not the proper remedy for resolving a delay of this nature in the civil context."  *Id.* at 600 (citing *Cepeda-Luna*, 989 F.2d at 358).

The Defendants essentially argue that the Government knew, at the time the Defendants were arrested administratively, that criminal prosecutions were intended, thus implicating the Speedy Trial Act.  The Government asserts, however, that the administrative arrests were unrelated to the later criminal indictments and that the deportation process continued without reference to the criminal proceedings.  The Defendants counter that the Government unnecessarily delayed prosecution of this case after the Defendants were arrested, for "tactical reasons,"  Mot. of Def. Gonzalez-Olvera at 2, that is, to collude with other federal officials to bring criminal charges.

For example, Hernandez-Carlon argues that although he was administratively arrested by ICE officials on August 2, 2005, he was interrogated during his ICE detention about matters charged in the September 22, 2005, superseding indictment.  He contends that "his August 2, 2005 arrest and the actions of I.C.E. were a ruse to facilitate his prosecution for the instant offenses."  Mot.

of Def. Hernandez-Carlon at 1. Therefore, according to Hernandez-Carlon, the *Drummond* exception to the Speedy Trial Act applies since there is "evidence of collusion between INS (or ICE) and the prosecuting authority, or evidence that the detention was for the sole or primary purpose of preparing for criminal prosecution." Mem. to Supp. Mot. of Def. Hernandez-Carlon at 1. Citing *United States v. Bravo*, No. 03-637, 2004 WL 1535787, at *1 (E.D. Pa. 2004), Hernandez-Carlon argues that since the ICE agents who arrested him on August 2, 2005, "had more than probable cause to arrest him for the instant [criminal] offenses," then the administrative arrest was merely a ruse to cover up the Government's efforts to continue the criminal investigation in preparation for issuance of the superseding indictment on September 22, 2005. Mem. to Supp. Mot. of Def. Hernandez-Carlon at 3. The Court in *Bravo* determined that the arrest of the defendant in that case was primarily criminal in nature because the investigating ICE officer "intended to seek criminal charges from the time of arrest" and he made a notation on the defendant's immigration paperwork indicating that the defendant was "awaiting trial" in order to "delay deportation of Defendant until an indictment had been obtained." 2004 WL 1535787, at *2-3. But *Bravo* is inapposite here because the facts were different. In the present case, the Defendants were all arrested solely for administrative reasons and the removal process continued until issuance of the superseding indictment.

        Additionally, "the fact that federal officials are aware of, and perhaps slightly involved in, the deportation proceedings . . . would not establish, as a matter of law, the requisite collusion" needed to apply the *Drummond* exception. *United States v. Grajales-Montoya*, 117 F.3d 356, 366-67 (8th Cir. 1997). Citing *United States v. Dyer*, 325 F.3d 464, 468-69 (3rd Cir. 2003), the Government avers that it may "conduct a criminal investigation of a person who is being detained

for removal." Opp. to Mot. of Def. Aguilar-Gomez, at 3; *see also Dyer*, 325 F.3d at 468-69 ("[T]he Speedy Trial Act's time limit is not triggered by the fact that the INS is conducting a reasonable investigation in order to decide whether the reentrant should be prosecuted or deported without prosecution."). For example, the Government states that the "primary purpose for the defendant's [Aguilar-Gomez] arrest on August 2nd was to detain him for removal for the U.S. because he is here illegally. That primary purpose did not change until the day he was indicted on criminal charges and a warrant was issued for his arrest. Only then was the removal process halted." Opp. to Mot. of Def. Aguilar-Gomez, at 4-5.

The Speedy Trial Act was not triggered by the Defendants' administrative arrests, which are civil in nature; therefore, the Act's thirty-day limit does not apply. The Defendants have failed to establish that their administrative arrests were a ruse for prosecution of the criminal charges, so the *Drummond* exception does not apply. Accordingly, the Court will deny the Defendants' motion to dismiss the indictment on Speedy Trial Act grounds.

### B. Aggravated Identity Theft

Contreras-Macedas, Mora-Gil, Francisco, and Lopez-Vargas were charged in the indictment with aggravated identity theft, pursuant to 18 U.S.C. 1028A(a)(1).[6] Section 1028A(a)(1), which was enacted on July 15, 2004, provides in relevant part:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly transfers, possesses, or uses*, without lawful authority, *a means of identification of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years. (emphasis added).

---

[6] Again, the Defendants filed a joint motion to dismiss for lack of evidence to support the aggravated identity theft charges.

Defendants are each charged with one count of aggravated identity theft because they allegedly possessed at least one illegal identity document (a fraudulent social security card, an employment authorization card, or a permanent resident card) that contained an identifying number belonging to a real person. They filed motions seeking dismissal of the charges for lack of evidence.

Defendants argue that this count of the indictment must be dismissed because the Government cannot prove that any of them had *knowledge* that the identifying number on the fraudulent documents in their possession belonged to a real person. They contend that, absent any evidence that they *knew* that the identification numbers belonged to an actual individual, the Government cannot sustain a conviction under 18 U.S.C. § 1028A. *Id.* The Government disagrees with this conclusion, arguing that it must only prove that Defendants *knowingly possessed* the illegal identity documents which contained identifying numbers that belonged to real people. Thus, according to the Government, Defendants are guilty as long as they *knew* that they *possessed* a fraudulent identity document. The Government argues that "proof that the defendants knowingly possessed a fake document with a real identifying number – even if they were unaware that the identifying number belonged to a real person – is sufficient proof for conviction under § 1028A(a)(1)." Opp. to Mot. of Def. Contreras-Macedas at 6.

The issue is whether 18 U.S.C. § 1028A's *mens rea* requirement applies only to the conduct involved – transfer, possession, and use – or extends to every element of the offense, in particular, "the means of identification of another person." This Court holds that "knowingly" applies to the conduct involved (transfer, possession, or use) and agrees with the Government that the Defendants did not have to know that the identification numbers on the fraudulent documents belonged to an actual person.

-12-

In *United States v. Montejo*, 353 F. Supp. 2d 643 (E.D. Va. 2005), the district court rejected the very argument that Defendants make in the instant case, holding that § 1028A does not require that a defendant have knowledge that the false identity documents that he possessed actually belonged to another person. In determining that the defendant did not have to know that the identification belonged to another person to be found guilty of aggravated identity theft, the district court discussed statutory interpretation at length, noting that "[o]rdinarily, qualifying words . . . apply only to their immediate antecedent." *Montejo*, 353 F. Supp. 2d. at 648. The court relied on the "plain language" of the statute to determine that "knowingly" modifies "transfers, possesses, or uses," and not the phrase "means of identification of another." *Id.*

> Since the term "knowingly" is immediately antecedent to the phrase "transfers, possesses, or uses," it must be read only to qualify those words. Accordingly, the ordinary meaning of the words in the statutory text reveals that the mens rea requirement applies only to the conduct involved, not to any other elements of the offense. To extend the modifier – "knowingly" – any further yields a result not countenanced by the words' ordinary meaning.

*Id.* The district court noted that this result was not inconsistent with the legislative intent of the statute. *Id.* at 653.

The *Montejo* district court did opine that the fact that a defendant did not have to know that the identity documents he possessed belonged to an actual individual was a somewhat absurd result. *Id.* at 655. However, the *Montejo* district court determined that despite the title of the section, "Aggravated Identity Theft," which implies stealing the identity of another person, the plain language of the statute was clear and could not be disregarded. *Id.* at 654. The Fourth Circuit affirmed *Montejo* on appeal, 442 F.3d 213 (4th Cir. March 29, 2006) (affirming based on the grammatical structure of the statute as well as its legislative history).

-13-

*United States v. Crounsset,* 403 F. Supp. 2d 475 (E.D. Va. 2005), recently came to the same conclusion as the *Montejo* court.  The defendant in *Crounsset* attacked his conviction under § 1028A on the grounds that the government failed to prove that he knew that the fraudulent identity document that he possessed (a passport) belonged to an actual individual.  403 F. Supp. 2d at 483. The court relied on the statutory interpretation analysis set forth by the *Montejo* district court and concluded that the "plain language of the statute" imposes no such requirement on the government. *Id*.  Accordingly, the *Crounsset* court held that the government was only required to prove "that the defendant knew that the passport he presented to airport officials … was fraudulent." *Id*.  "To read § 1028A otherwise would effectively narrow the proscribed conduct to include an additional element not expressly required by the plain language of the statute and would impose on the government an often insurmountable burden." *Id.*

The only other district court case that has addressed the issue, *United States v. Beachem*, 399 F. Supp. 2d 1156 (W.D. Wash. 2005), rejected the conclusions reached by the district courts in *Montejo* and *Crounsset.  Beachem* noted that there is Supreme Court precedent holding that "a statute's qualifiers could be read to modify words to which they were not necessarily adjacent, in order to provide an appropriate level of scienter to justify a punishment under the Constitution." *Id*. at 1158 (citing *United States v. X-Citement Video Inc*., 513 U.S. 64, 79 (1994) and noting that *Montejo* distinguished this precedent).  The *Beachem* decision also relied on the Ninth Circuit's decision in *United States v. Meek*, 366 F.3d 705 (9th Cir. 2004), which followed the Supreme Court decision in *X-Citement Video* and held that the *mens rea* requirement of the statute at issue "must be extended to require proof that a defendant had a subjective belief that the person whom he was attempting to engage in sexual activity was a minor."  366 F.3d at 718; *see also Beachem*, 399 F.

-14-

Supp. 2d at 1158.

In addition, the *Beachem* court was persuaded by the title of § 1028A, "Aggravated Identity Theft," and the fact that "the legislative history of the statute speaks directly about 'provid[ing] enhanced penalties for persons who *steal* identities.'" *Id.* (citing H.R. Rep. No. 108-528, at 3 (2004), *reprinted in* 2004 U.S.C.C.A.N. 779, 783) (emphasis in original). The *Beachem* court concluded that, under § 1028A(a)(1), "to justify the additional two years' imprisonment for Defendant that the United States is seeking under the statute, the United States must provide proof that Ms. Beachem had knowledge that the identification she used belonged to another person." *Id*.

Defendants also read the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129 (2005), as support for their argument that "knowingly" modifies "means of identification of another person" in § 1028A. In *Arthur Andersen*, the relevant portion of the statute at issue provided that a person commits a crime if he "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person . . . with intent to . . . cause or induce any person" to withhold or destroy documents. *Id.* at 703. The Court held that "knowingly" modifies "corruptly persuades" because that is "how the statute most naturally reads." *Id*. at 704. The Government counters that the holding in *Arthur Andersen* actually supports its argument that the adverb "knowingly" only modifies the verbs, "transfers, possesses, or uses," and that the Government need not show that the Defendants knew the false identity documents belonged to another person. The *Arthur Andersen* Court did acknowledge that it has "recognized that … the *mens rea* at least applies to acts that immediately follow, if not to other elements down the statutory chain." *Id*. at 704. This Court finds that this reading is consistent with the proposition that when a court considers the plain language of a statute, words are generally modified by their direct

antecedents. *See e.g., Montejo*, 353 F. Supp. 2d at 648.

The Supreme Court has set aside the plain language of a statute in order to create a *mens rea* (or a knowledge of wrongfulness requirement) where the statute threatens to impose serious penalties for innocent conduct. *See X-Citement Video*, 513 U.S. at 68-72; *United States v. Staples*, 511 U.S. 600 (1994); *see also Montejo*, 353 F. Supp. 2d at 649 (noting that *X-Citement Video* and *Staples* "are binding authority that the *mens rea* requirement applies only to those elements of the offense that punish otherwise innocent conduct" and that these cases "require that non-explicit or ambiguous *mens rea* requirements be extended only insofar as necessary to protect otherwise innocent conduct"). The *Montejo* district court concluded that because § 1028A explicitly requires that a defendant must have engaged in other wrongful conduct, as enumerated in § 1028A(c)(1), "there is no risk that restricting the *mens rea* requirement to the conduct involved [knowing transfer, possession, or use of documents] will criminalize – or even chill – otherwise innocent behavior." *Montejo*, 353 F. Supp. 2d at 650.

> [Defendant's conduct is] punishable by law whether he knew that the means of identification in his unlawful possession belongs to someone else or was false altogether. In other words, using a means of identification that is not one's own, regardless of whether it belonged to someone else, is not lawful or constitutionally protected. Montejo may not have known that he was using a means of identification that belonged to someone else, but he did know that he was engaged in otherwise unlawful conduct.

*Id.* at 650, 651 ("[D]efendants engaged in otherwise guilty conduct who are subjected to stiffer criminal penalties due to the existence of some fact to which they were not aware at the time of the offense are not entitled to any additional protection through judicial imposition of a scienter requirement where Congress did not impose one."); *see also Arthur Andersen*, 544 U.S. at 706

("[L]imiting criminality to [those] conscious of their wrongdoing sensibly allows 1512(b) to reach only those with the level of culpability … we usually require in order to impose criminal liability.").

As previously stated, this Court concludes that the Defendants did not have to *know* that the fraudulent identity documents belonged to a real person. The Court agrees with the reasoning of the *Montejo* district court decision. The plain language of the statute cannot be ignored. The statute requires the Government to prove that the Defendants knowingly possessed, transferred, or used false identity documents which contained identification numbers that belonged to a real person; the Government does not have to prove that the Defendants knew that the false identify documents contained identification numbers of actual people. The risk runs to the wrongdoer that the fraudulent identity he possessed actually belonged to a real person. "[A] person who unlawfully transfers, possesses, or uses a means of identification that does not belong to him does so at the risk that it belongs to someone else." *Montejo*, 353 F. Supp. 2d at 651 (noting that "Montejo's mistake was not one of fact, but rather of law by failing to realize the risks associated with possessing false documents"). The additional harm that justifies an additional two-year enhancement is the harm to the real person whose identity was misappropriated. The Defendants knowingly used, transferred, or possessed false identity documents. Because those false identity documents included the identification numbers of actual individuals, the Defendants are appropriately charged with aggravated identity theft. Therefore, the Court will not dismiss the aggravated identity theft charges.

### III.  CONCLUSION

For the reasons stated, the Court will deny Defendants' motions to dismiss.  A memorializing order accompanies this memorandum opinion.


Date: June 20, 2006                                                    /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge